**UNION PACIFIC RAILROAD COMPANY**

v.

**The UNITED STATES.**

**No. 48579.**

United States Court of Claims.
June 7, 1955.

See also, 101 F.Supp. 78, 121 Ct.Cl. 463.

Lawrence Cake, Washington, D. C., for plaintiff. Raymond A. Negus, Washington, D. C., was on the briefs.

Paris T. Houston, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

The plaintiff sues for $46,387.12 which it alleges is a balance due on what it claims is the correct and lawful freight charges on vehicles shipped over its lines of railroad and other connecting common carriers during the period from December 29, 1941 to July 7, 1947.

The bills involved in this suit were divided into seven groups. As set out in finding 4, it was agreed by stipulation of the parties made at pre-trial conferences that on Groups 1, 4, 6 and listed portions of Groups 2 and 3 there is a balance due the plaintiff in the aggregate sum of $23,219.83, that on Group 7 there is a balance due the defendant in the sum of $388.58, making a net balance due the plaintiff on these groups of $22,831.25.

The plaintiff has withdrawn its claims on the bills of lading involved in certain other shipments listed under Group 2.

The only issues remaining are (1) the transportation charges on a portion of the bills in Groups 2 and 3 which covered shipments to Cheyenne, Wyoming, and thence to Pacific coast ports for export, and (2) the transportation charges on a number of bills included in Group 5 which covered shipments moving to Portland, Oregon, or Seattle, Washington, for export to the Soviet Union, and shipments moving to Los Angeles Harbor, California, for export to the United Kingdom.

As to the shipments involved in the parts of Groups 2 and 3 that remain in issue, the plaintiff claims that through export rates were not applicable under the Section 22 quotations relied on by the defendant and that the lowest applicable rates are on the basis of combinations of local rates to and from Cheyenne. It is the position of the defendant that the applicable charges should be on the basis of through export rates without land-grant deductions under AAR, Sec. 22 Quotation Nos. 265 and 265–A, and Union Pacific Sec. 22 Quotation No. 22.

According to plaintiff's position, there is a balance due the plaintiff in the sum of $837.62 on a portion of these shipments and $1,100.50 on another portion. If the defendant's position is correct, that it is entitled to export rates on these shipments, it is entitled to recover from the plaintiff the sum of $13,113.30 by reason of an overpayment to the plaintiff in this aggregate amount. The issue turns on whether or not these shipments were entitled to storage-in-transit privileges at Cheyenne.

The defendant apparently was having some difficulty in establishing its right to export rates on the various shipments that were being made. Controversies had arisen and proceedings had been instituted. Following several conferences an offer was made on behalf of the carriers including the plaintiff that by agreement of the parties the export rates as published in the applicable tariff on Government traffic to Pacific coast ports for export, should be applied without requiring compliance with certain restrictions and conditions which are set out in finding 9. The details of Union Pacific Railroad, Section 22 Quotation No. 22, and Amendment 1 thereto, under which defendant contends that it was entitled to storage-in-transit privileges, are set out in detail in findings 10, 11 and 12.

It is the contention of the plaintiff that this so-called agreement does not apply to these particular shipments because it was never accepted by the defendant in the manner prescribed. The proposal was included in a letter in which it was stated that if the amendments were acceptable the defendant should return to the company one duplicate with the acceptance

signed. Correspondence in reference to action upon this agreement is set out in findings 12 and 13.

Although Amendment 1 to Union Pacific Railroad Section 22 Quotation No. 22, was not formally accepted by the defendant through the signature of one of its officers on the acceptance form contained in this document, the evidence shows that the defendant did in fact accept the quotation and that both parties acted pursuant to its provisions. As a matter of fact, the plaintiff was notified that the agreement had been filed and would be complied with as long as it was on file.

■ For these reasons we find that the defendant is entitled to recover from the plaintiff by virtue of an overpayment on these particular shipments the sum of $13,113.30.

The Group 5 bills which are in issue cover a great many shipments. The complete statements of the facts in reference thereto are set out in findings 18 to 36 inclusive. We can see no good purpose to be served in repeating in detail the facts set out in those findings. They include items 235, 270, 285 and 290.

The issue with respect to the bills in this group is whether the transportation charges should be computed on the basis of published export rates to Pacific ports without land-grant deductions in accordance with the Section 22 agreement and the acceptance thereof by the Government, or whether the rates should be computed on the basis of published export rates with land-grant deductions, disregarding the agreement.

Prior to the making of the agreement the Government was having difficulty as shown by various applications before the Interstate Commerce Commission in securing the export rates on the various shipments that were being made. In fact, on many of them it is doubtful whether it would have been possible for the Government to obtain the advantage of through export rates. In order to resolve the difficulties numerous carriers involved, including the plaintiff, offered the terms of the Section 22 agreement by which it was agreed that all these carriers would, upon acceptance of the agreement by the Government, collect only the through export rates without land-grant deductions. The companies complied with this agreement and as we have held, the defendant by its conduct accepted the agreement and both parties acted thereon.

■ The Office of Defense Transportation in its quarterly report to the President for the period ending March 31, 1944 recited that Section 22 Quotations had been offered by the railroad after several conferences, that it had been accepted by the Government and that under it the Government was receiving the benefit of export rates and other advantages, that "It is estimated by the War, Navy and Treasury-Procurement Division Departments that there will be a saving through 1945 of approximately 78 million dollars." In these circumstances, the land-grant deductions should not be allowed in addition to the reduced export rates unless all of the conditions were complied with and the requirements set out in the agreement were met.

As set out in our findings, the defendant did not comply with a number of conditions in connection with Items 235, 270, 285 and 290 of TCFB Export Tariff 29 Series. For these reasons the defendant is manifestly not entitled to land-grant deductions on these particular items. It would be a repudiation of the agreement on which the various parties had acted during practically the entire period involved. However, the defendant by virtue of the agreement and its acceptance is entitled to the export rates. On the basis of these rates the plaintiff is entitled to recover on Items 235, 270, 285 and 290 a balance of $12,433.14.

Based upon our findings and the other documents of record, the plaintiff is entitled to recover the sum of $35,652.97 on the various items involved and the defendant is entitled to recover the sum of $13,501.88 in overpayments of freight charges on other items as tabulated. Plaintiff is therefore due the net sum of

$22,151.09, and judgment will be entered accordingly.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff, a corporation of the State of Utah, is a common carrier by railroad over its own lines and in connection with other carriers.

2. From December 29, 1941, to July 7, 1947, plaintiff, together with other common carriers whose lines connect with plaintiff's lines, participated in the transportation of shipments of jeeps for defendant from various points in the United States to Cheyenne, Wyoming; Nebo, California; Seattle, Washington; Portland, Oregon; Los Angeles Harbor, California, and other points on its lines.

3. On November 6, 1951, the court granted plaintiff's motion for summary judgment on the issue of the liability of the defendant for transportation charges on the basis of classifying and rating jeeps as passenger motor vehicles. Entry of judgment was deferred pending the filing by the General Accounting Office of a report showing the amount due in accordance with the decision. Thereafter, the General Accounting Office prepared a report showing its determination of the amount due plaintiff on each of the bills involved in this action. The report was accepted only in part by plaintiff, because the determination made by the General Accounting Office as to the amounts due raised several issues other than the classification and rating of the jeep as a passenger motor vehicle.

4. For the purpose of resolving the issues, the bills involved in this suit were divided into seven groups. By stipulations made at pre-trial conferences and during the trial, the parties have agreed that:

(a) On the 76 bills included in Group 1, there is due plaintiff the sum of $16,-644.40.

(b) On the nine bills included in Group 4, there is due plaintiff the sum of $3,721.19.

(c) On the bills designated as Group 6, there is due plaintiff the sum of $162.-60.

(d) On the bills included in Group 7, there is due the defendant the sum of $388.58.

(e) With respect to bills of lading WT–5469478, WT–5469973, WT–5469972, WT–5469986, WT–5469950, WT–3966522, WT–3966994, WT–3966516, WT–3967002, WT–3966523, WT–3966535, WT–3966530 and WT–3966533, covering non-transited shipments to Nebo, California, included in the bills listed in Group 2, there is due the plaintiff a balance of $1,347.48.

(f) With respect to bills of lading WT–5469968, WT–3966531, WT–3966534, WT–3966996, WT–3967001, WT–3966508, WT–3966532, WT–3989254, WT–3989258, WT–3989276, WT–3989277, WT–3989271, WT–3966997 and WT–3966518, included in the bills listed in Groups 2 and 3, covering shipments to Nebo, California, there is due the plaintiff a balance of $1,228.60.

(g) With respect to bills of lading WQ–6693673, WQ–6693159, WQ–6693805 and WQ–6693824, included in the bills listed in Groups 2 and 3, covering shipments to Cheyenne, Wyoming, there is due the plaintiff a balance of $115.56.

(h) With respect to bills of lading WT–5469226, WT–5469427, WT–5469655, WT–5469493, WT–5469494, WT–5469978, WQ–3989264, WQ–3989256, WQ–3989257, WT–3989260, WT–3989261, WT–3989269, WT–3989279 and WT–3989270 (included in the bills listed in Groups 2 and 3), covering shipments to Nebo, California, thence to Pacific coast ports for export, the destination carriers being carriers other than the Union Pacific, the position of the defendant is that the applicable

charges should be on the basis of the through export rates (without land-grant deductions) under AAR Section 22 Quotation No. 16, which authorized storage in transit, and AAR Section 22 Quotation Nos. 265 and 265–A which authorized application of the export rates without land-grant deductions, and that settlement of any balances due or overpayments should be made with the destination carriers. The plaintiff has withdrawn its claims on these bills of lading.

5. The only issues in suit are the transportation charges due on (1) a portion of the bills included in Groups 2 and 3, which covered shipments to Cheyenne, Wyoming, and thence to Pacific coast ports for export, and (2) the 107 bills included in Group 5, which covered shipments moving to Portland, Oregon, or Seattle, Washington, for export to the Soviet Union, and shipments moving to Los Angeles Harbor, California, for export to the United Kingdom.

### Shipments Stopped in · Transit at Cheyenne, Wyoming

6. On bills of lading WQ–6693679, WQ–6693600, WQ–6693682, WQ–6693164, WQ–6693168, WQ–6693165, WQ–6692645, WQ–6692646, WQ–6693676, WQ–6693163, WQ–6693663, WQ–6693166, WQ–6693599, WQ–6693677, WQ–6693667, WQ–6693666, WQ–6693681, WQ–6693656, WQ–6693675, WQ–6693672, WQ–6693665, WQ–6692649, WQ–6693671, WQ–6692650, WQ–6693678, WQ–6693662 and WQ–6693695, included in the bills listed in Groups 2 and 3, covering shipments to Cheyenne, Wyoming, thence to Pacific coast ports for export, the Union Pacific being the destination carrier, the position of the defendant is that the applicable charges should be on the basis of the through export rates (without land-grant deductions) under AAR Section 22 Quotation Nos. 265 and 265–A and Union Pacific Section 22 Quotation No. 22. On that basis there is an overpayment due the defendant of $13,113.30. The plaintiff's position is that the through export rates were not applicable under the Section 22 quotations relied on by the defendant and that the lowest applicable charges are on the basis of combinations of local rates to and from Cheyenne. On that basis there is due the plaintiff for the movements to Cheyenne a balance of $837.62.

7. On bills of lading WQ–6692651, WQ–6693661, WQ–6693683, WQ–6693674, WQ–6692647, WQ–6692648, WQ–6693162, WQ–6693807, WQ–6693808, WQ–6693810, WQ–6693690, WQ–6693685, WQ–6693689, WQ–6693693, WQ–6693694, WQ–6693688, WQ–6693803, WQ–6693686, WQ–6693806, WQ–6693684, WQ–6693699, WQ–6693698, WQ–6693697, WQ–6693696, WQ–6693692, WQ–6693687, WQ–6693802, WQ–6693809, WQ–6693812, WQ–6693819, WQ–6693817, WQ–6693828, WQ–6693821, WQ–6693820 and WQ–6693822, covering shipments to Cheyenne, Wyoming, thence to Pacific coast ports for export, the destination carriers being carriers other than the Union Pacific, the position of the defendant is that the applicable charges should be on the basis of the through export rates (without land-grant deductions) under AAR Section 22 Quotation Nos. 265 and 265–A and Union Pacific Section 22 Quotation No. 22, and that on that basis there have been overpayments of the through charges to the destination carriers. If the court finds for the defendant on this issue, the plaintiff withdraws its claims on these bills of lading. The plaintiff's position is that the through export rates were not applicable under the Section 22 quotations relied on by the defendant and that the lowest applicable charges are on the basis of combinations of the local rates to and from Cheyenne. On that basis and if the court shall find that the through export rates were not applicable under the Section 22 quotations cited, there is due the plaintiff for the movements to Cheyenne a balance of $1,100.50.

8. The shipments, referred to in findings 6 and 7, to Cheyenne, Wyoming, and thence to Pacific coast ports, were made from July 12 to August 8, 1942.

9. AAR Section 22 Quotation Nos. 265 and 265–A, copies of which are in evidence and made a part hereof by reference, are dated February 10 and August 29, 1944. They offered, in behalf of the carriers, parties to TCFB Export Tariff 29 Series, including the plaintiff, the export rates published in TCFB Export Tariff 29 Series (without land-grant deductions) on Government traffic to Pacific coast ports for export, without requiring compliance by the Government with Items 235, 270, 275, and 290 of the said tariff. AAR Section 22 Quotation Nos. 265 and 265–A were made retroactive generally to January 1, 1942, but as to traffic stored in transit under other AAR Section 22 quotations authorizing storage in transit, Quotation Nos. 265 and 265–A applied only to such traffic moving from points of origin on and after January 1, 1944. AAR Section 22 Quotation Nos. 265 and 265–A, in evidence as plaintiff's exhibits 2 and 3, were formally accepted by the War Department, Navy Department, and other agencies of the Government.

Since the shipments under the bills of lading, described in findings 6 and 7, moved in 1942 and were stored in transit at Cheyenne, Wyoming, the defendant does not contend that it was entitled to storage-in-transit privileges under AAR Quotation Nos. 265 and 265–A but asserts that Union Pacific RR Section 22 Quotation No. 22 and Amendment 1 thereto were applicable to such shipments and that, under these quotations, storage-in-transit privileges were available to the Government at Cheyenne, Wyoming.

10. Union Pacific RR Section 22 Quotation No. 22, in evidence as defendant's exhibit 15, was dated September 8, 1942, addressed to the Chief of Transportation, Services of Supply, War Department, Washington, D. C., and was signed by William Jeffers, President of the Union Pacific Railroad Company. A space was provided on the form for a written acceptance by the War Department, and on October 1, 1942, the acceptance was signed by W. J. Williamson, Colonel, Transportation Corps, for the Chief of Transportation, Services of Supply. The document read in pertinent part as follows:

"Subject to acceptance, the following quotation is made under authority of Section 22 of the Interstate Commerce Act [49 U.S.C.A. § 22].

"Heavy motor vehicles and their equipment and supplies and other property of the United States Government, except high explosives, moved on Government bills of lading and which can be stored in the open without damage from the elements may be shipped in carloads to an open storage yard on the premises of the undersigned Union Pacific Railroad Company (hereinafter called 'Company'), at Cheyenne, Wyoming, or to such other open storage yards on the lines of the Company as may be agreed upon between the Company and the Government, and there stored in transit under the following conditions:

\* \* \* \* \* \*

"(3) Shipments must be consigned in care of the Freight Agent at the storage point, and transportation charges on the basis of rates in effect at the time of shipment from point of origin to the storage point will apply and become payable at the time the shipment is unloaded for storage.

"(4) Storage in transit privileges under the through rates from point of origin to final destination or port of export will be available when and as authorized in tariffs lawfully on file with the Interstate Commerce Commission or where permitted by quotations made under Section 22 of the Act to Regulate Commerce on file with the War or Navy Departments of the United States Government.

"(5) Where storage in transit is accorded as outlined in Paragraph (4) above the identity of lading of each inbound car is to be preserved

while stored, and each order for forwarding of a carload outbound from storage must give reference to the inbound car, the lading of which the order covers. There is to be no substitution of tonnage.

\* \* \* \* \* \*

"(10) This quotation may be applied retroactively to cover shipments of the same kind and character as those covered herein which have already been placed in storage at Cheyenne, Wyoming, or which are now en route thereto."

11. Amendment No. 1 to Union Pacific RR Section 22 Quotation No. 22, in evidence as defendant's exhibit 15, was dated December 15, 1943, addressed to the Chief of Transportation Army Service Forces, War Department, Washington, D. C., and was signed by William Jeffers, President of plaintiff. It provided in part as follows:

"Referring to Union Pacific Railroad Company's Quotation made under authority of Section 22 of the Interstate Commerce Act, dated September 8, 1942 and accepted for the Chief of Transportation, Services of Supply, by W. J. Williamson, Colonel, Transportation Corps, Chief of Traffic Control Division, on October 2, 1942, and relating to the storage on the premises of the Railroad Company at Cheyenne, Wyoming and at such other points as may be mutually agreed upon between the Railroad and the United States of America, of property of the United States moving in railroad transportation. Said storage yard at Cheyenne, Wyoming, has been in operation and no other storage yards on premises of the Railroad Company have been agreed upon. Said Quotation is hereby amended effective as of September 8, 1942, as follows:

"Sections (4) and (5) shall be, and are hereby, combined and amended to read as follows:

"Item No. 1. *Storage in Transit Privileges.*

"Each shipment of property owned by the United States Government, except high explosives, moving on Government bills of lading and which can be stored in the open without damage from the elements, may be stopped in transit at Cheyenne, Wyoming, for storage by and at the expense of the Government, and reshipped therefrom to destinations in the United States or Canada at the through all-rail rate specified in Item No. 3 hereof. Such stopping is referred to in this Quotation as the 'Transit Privilege'. Such privilege will apply only when the company receives the line haul to and from Cheyenne, Wyoming. No such shipment as to which any of the applicable terms and provisions of this Quotation have not been complied with shall be entitled to the transit privilege.

\* \* \* \* \* \*

"Item No. 3. *Rates to be Applied.*
"Inbound rate:

"(a) The rate applicable on the inbound movement of a shipment to the transit point will be the all-rail carload rate on such shipment from its point of origin in effect on date of shipment therefrom, to the transit point, applicable on freight having its destination at such point.

"(b) Through rate subject to provisions of Item No. 12:

"Each shipment made from its original point of origin under the terms of this Quotation prior to May 15, 1943, will be subject and entitled to the lowest through all-rail carload rate (joint or combination) thereon, applicable over the route of movement via Cheyenne, Wyoming, from such point of origin to destination in effect on date of such shipment; and each shipment made from its original point of origin under the terms of this Quotation on and after May 15, 1943, will be subject and entitled to the lowest through all-rail carload rate (joint or combination) thereon, applicable

over the route of movement via Cheyenne, Wyoming, from such point of origin to destination in effect on May 14, 1943; as shown in tariffs then in effect on file with the Interstate Commerce Commission or any State regulatory authority, plus all other charges, including, without limitation, diversion, reconsignment and/or switching charges, if any, as provided in this or other applicable Quotations, or tariffs on file with the Interstate Commerce Commission or any State regulatory authority. (See Note.)

"Note—Rates applicable via Corlett Junction, Wyoming, will be considered as applicable via Cheyenne, Wyoming."

\* \* \* \* \* \*

"Item No. 10. *Method of Settlement.*

"On each shipment forwarded from the transit point to destination, the Government will pay the through rate applicable on such shipment, plus any other charges accruing under the terms of this Quotation in addition to such through rate, minus the rate paid on such shipment into the transit point, and if the amount of such through rate is less than the rate or rates so paid, the carrier will make appropriate refund. The Government agrees that in the event settlement with the carrier of freight charges on the inbound shipment has been or later is effected on a basis different from that indicated by the reference to the inbound shipment, final settlement will be made as provided in this item on the basis of actual freight charges finally paid by the Government."

12. The last two paragraphs of Amendment No. 1 to plaintiff's Section 22 Quotation No. 22 read as follows:

"This document, when accepted by the officer to whom addressed, shall constitute an agreement supplemental to the aforesaid Section 22 Quotation agreement dated September 8, 1942. It is understood that nothing herein contained shall be construed as modifying said agreement of September 8, 1942 except as herein specifically provided.

"This letter is written in duplicate, and if the amendments therein set forth are acceptable please return to us one duplicate with the acceptance signed."

Following the above-quoted statement a blank was provided on the amendment for the signature of the official accepting the quotation. This acceptance form was never signed by any official of the defendant nor was a duplicate copy, signed by an officer of defendant, returned to plaintiff. However, on December 30, 1943, the Office of Chief of Transportation Army Service Forces wrote plaintiff as follows:

"This will acknowledge your letter of 16 December 1943, file D–5707–1806–631–A, with which you forwarded Amendment No. 1 dated 15 December 1943, to your Section 22 Quotation No. 22 covering ground storage in transit at Cheyenne, Wyoming.

"This Amendment has been recorded and, as information, copies have been furnished the Finance Officer, U. S. Army, Washington, D. C., the General Accounting Office, and other interested offices of the War Department."

On December 30, 1943, the Chief of Transportation, Transportation Corps, War Department, addressed the Finance Officer, U. S. Army, as follows:

"1. Inclosed is photostatic copy of Amendment No. 1, dated 15 December 1943, to Union Pacific Section 22 Quotation No. 22, dated 8 September 1942, covering ground storage in transit at Cheyenne, Wyoming.

"2. This Amendment, effective 8 September 1942, has been acknowledged to the Union Pacific Railroad Co. as per copy of inclosed letter."

On December 31, 1943, the Zone Transportation Officer at New York, N. Y., was advised by the Chief of Transportation as follows:

"1. Inclosed is copy of Amendment No. 1, dated 15 December 1943, to Union Pacific Section 22 Quotation No. 22, dated 8 September 1942, covering ground storage in transit at Cheyenne, Wyoming.

"2. As provided therein, this Amendment is effective as of 8 September 1942."

This same letter was written to the following:

Transit Storage Division, ATTN? [sic] Major H. R. Brinkman, Room 4–B–656.

Zone Transp. Officer, 7th Transp. Zone, 201 World Herald Bldg., Omaha, Nebr.

C. O., Chicago, Chem. Warfare Procurement Dist., Room 1600, Civic Opera Bldg., Chicago, Ill.

C. O., Dallas Chem. Warfare Procurement Dist., 7th Floor Mercantile Bank Bldg., Dallas, Texas.

C. O., Pittsburgh Chem. Warfare Procurement Dist., American Bank Bldg., 600 Grant St., Pittsburgh, Pa.

Chief of Engineers. Attn. Supply Div., Field Service, Requirement & Stock Control Branch, Inventory Control Sec., Shipping Sub-Sec., Room 1225, Temp "F", 23rd & D Sts., N. W.

13. On January 5, 1944, the Vice-President of the plaintiff wrote the Chief of Transportation Army Service Forces as follows:

"Acknowledging your letter of December 30th advising that Amendment No. 1 to our Section 22 Quotation No. 22 covering ground storage in transit at Cheyenne, Wyoming, had been recorded.

"In my letter of December 16th I requested the return of one duplicate copy of this Quotation with your acceptance noted thereon and it will be appreciated if you will kindly comply with this request so that procedure will conform with that taken in connection with the original Quotation and make our record definite as to the full consist of the amendment."

The Office of the Chief of Transportation replied to the foregoing letter under date of January 11, 1944, as follows:

"Refer to your letter of 5 January 1944, file D–5707–1806–631–A, in which you request that a signed copy of Amendment No. 1 to your Section 22 Quotation No. 22 covering ground storage in transit at Cheyenne, Wyoming, be returned for your files.

"The provisions of this amendment and the original quotation will be observed so long as they remain on file in this and other interested offices.

"It is not deemed necessary, therefore, to formally accept this amendment, particularly in view of the fact that the quotation, as amended, is merely a unilateral contract.

"Although some quotations have been formally accepted by the War Department in the past, the practice has been discontinued for the reasons indicated."

14. Prior to the latter part of 1942 or the early part of 1943, Section 22 quotations were formally accepted by the War Department through an authorized representative, who affixed his signature to the acceptance form appearing on the quotations. As indicated in the above-quoted letter, however, this policy was changed sometime in 1942 or during the early part of 1943 when the practice of the War Department was to acknowledge receipt of the quotation by informing the carrier that it had been received, placed on file, and would be used in the best interests of the Government. Following the acknowledgment of the quotation, the Office of the Chief of Transportation distributed copies of the quotation to the Army Finance Office, the General Accounting Office, and other agencies of the Government having an interest in the quotation.

When the War Department received a Section 22 quotation which provided for less favorable rates than had been requested or which was otherwise unsatisfactory to the War Department, the quotation was, in most cases, returned to the carrier. It was not the general practice of the War Department to make a formal distribution of Section 22 quotations which were unsatisfactory or of no value to it. The policy and practice with respect to the War Department's acceptance of Section 22 quotations after the early part of 1943 was not adhered to in all instances. Plaintiff's exhibit 2, which is entitled "A. A. R. Section 22 Quotation No. 265", was issued February 10, 1944, and addressed to the War Department, Navy Department, Treasury Department, and the War Food Administration. This quotation was thereafter formally accepted by each of such departments, whose authorized officers signed the acceptance form on a copy of the quotation and returned it to the Association of American Railroads.

Amendment No. 1 to AAR Section 22 Quotation No. 265–A was issued September 8, 1944, and was formally accepted on behalf of the War Department, the United States Marine Corps, the War Food Administration, and other agencies.

15. Among the bills in Groups 2 and 3, which are in dispute, there is included plaintiff's bill F–182507. This bill covered charges on the Government bill of lading dated July 25, 1942, for a shipment from Toledo, Ohio, to Cheyenne, Wyoming, forwarded by the Willys-Overland Motors, Incorporated, and consigned to the agent of the Union Pacific Railroad at Cheyenne, Wyoming, for Port Quartermaster, San Francisco Port of Embarkation, Fort Mason, San Francisco, California. This identical shipment was reforwarded from Cheyenne, Wyoming, to Stockton, California, on October 17, 1942, by a Government bill of lading which incorporated the first bill of lading by reference thereto. The latter bill of lading on the face thereof stated "Transit Charges at Cheyenne, Wyo., to be Paid

in Connection with Settlement of Charges on this B/L." The carrier's bill for transportation charges on this shipment was on the basis of a through rate, less the amount which had been paid in on the inbound bill of lading, plus a transit charge.

In defendant's exhibit 16 and in plaintiff's exhibit 11, there are included a number of other shipments involved in Groups 2 and 3 which were billed and collected on the basis of through charges by destination carriers of the outbound movements from Cheyenne, Wyoming. The destination carriers were the Union Pacific Railroad Company, Southern Pacific Company or the Pacific Electric Railway.

16. Amendments Nos. 2 and 3 to Union Pacific RR Section 22 Quotation No. 22 were issued on November 12, 1945, and December 3, 1945, respectively. Each of these amendments contained the following provisions:

### Acceptance of Quotation

"This Quotation, when accepted by the government by making any shipment or settlement under the terms hereof or otherwise, will constitute an agreement between the parties hereto as to the transportation services herein described."

17. Although Amendment No. 1 to Union Pacific RR Section 22 Quotation No. 22 was not formally accepted by the defendant through the signature of one of its officers on the acceptance form contained in this document, the evidence shows that the defendant did in fact accept the quotation and that both parties acted pursuant to its provisions.

### Group 5 Bills—Export Rates and Land-Grant Deductions

18. The issue with respect to the bills in this group is whether the transportation charges should be computed at the rates quoted in AAR Section 22 Quotation Nos. 265 and 265–A, which provided for the application of the export rates published in Trans-Continental Freight

Bureau Tariff No. 29 Series, hereinafter called TCFB Export Tariff 29 Series, without land-grant deductions and without requiring compliance by the Government with Items Nos. 235, 270, 275, and 290 of that tariff, or whether such transportation charges should be computed on the basis of the export rates published in TCFB Export Tariff 29 Series with land-grant deductions.

19. All but three of the shipments in question were made in 1942 to Portland, Oregon, and Seattle, Washington. There were three shipments in March 1943 to Los Angeles Harbor, California. At the time of such shipments, the export rates to the ports named were published in the TCFB Export Tariff No. 29 Series, which contained numerous conditions and restrictions, including the following:

"Item 235—

"Rates and privileges as stated in this tariff apply only to freight which does not leave the possession of the rail carriers until delivered to common carriers by ocean at the Pacific Coast ports of interchange with such common carriers by ocean and rail carriers' responsibility shall cease upon such delivery.

"Item 270—

"(a) Rates authorized apply only to export traffic when specific destination beyond Pacific Coast port of export is shown in bill of lading or shipping receipt issued at time of shipment, and the freight is not diverted while in possession of rail carriers to another destination, nor held at port of export or en route thereto on request of shipper, owner or other party interested. However, permission to divert freight while en route to port of export or at port of export will be allowed, provided new permit is secured showing change in destination and steamer booking.

"(b) Export traffic complying with paragraph (a) hereof is also subject to Item 255 and to rules and regulations in Items 275, 280 and 290. In event of failure to comply with Items 255, 275, 280 and 290, rates authorized apply, but freight is subject to the charges for unloading, switching, demurrage and storage, applicable to domestic traffic at port of export as published in terminal tariffs of individual lines, parties hereto, and lawfully on file with Interstate Commerce Commission.

"Item 290—

"(a) Except as provided in Item 285, through export bills of lading must be taken out at the time and place of shipment or in exchange for the original domestic bill of lading or shipping receipt within a period of 20 days from date of domestic bill of lading or shipping receipt issued for the consignment except as to shipments which have been given an in-transit privilege under lawfully published tariffs of lines parties hereto.

"(b) On shipments which have been given intransit privilege at points other than the port of export, through export bills of lading must, except as provided in Item 285, be taken out at the time of reshipment from the transit point or in exchange for domestic bill of lading or shipping receipt issued at transit point within 20 days from date of such bill of lading or shipping receipt.

"Item 285—

"Through export bills of lading may be taken out after the twenty-day period provided in Item 290, but shipments covered by such bills of lading are subject to conditions of Item 270."

20. On November 19, 1942, the Comptroller General wrote the Secretary of the Treasury in part as follows:

"I have had for consideration your letter dated October 10, 1942, as follows:

" 'Certain restrictions governing the application of export rates pub-

lished to apply via Pacific Coast ports have long been the subject of controversy between rail carriers and Government agencies, notably the War and the Navy Departments and the Procurement Division of this Department. The restrictions in question have had the effect of forcing the Government to pay charges based on domestic rates on the same materials which if shipped by commercial shippers to the same foreign destinations under commercial trade practices would move subject to export rates.

" 'It is the opinion of this Department that the restrictions referred to result in the application on Government shipments of rates which are unreasonable, discriminatory and prejudicial in violation of Section 1, 2 and 3 of the Interstate Commerce Act and if such violations were brought to the attention of the Interstate Commerce Commission through formal procedure, carriers participating therein would be required to show cause why they should not be denied payment on shipments of public property exported in accordance with Government procedures in excess of amounts based upon published export rates, less whatever benefits the Government is entitled to otherwise. Every means available, short of filing a formal complaint with the Interstate Commerce Commission, have been employed to induce carriers to accord the Government the full benefit of export rates and waivers have been filed with War, Navy, Agriculture and Treasury Departments, but such waivers have been made subject to contingencies which render them of little, if any, practical value. Formal procedure has not been resorted to for two reasons. First, it involves the preparation and filing of petitions and exhibits, hearings, introduction of testimony, examination and cross-examination of witnesses and delay for, or even without, cause. Secondly, it has been a practice of long standing in connection with the freight rates applicable to shipments of public property, that when prima facie evidence of discrimination against the Government can be established, the remedy is often obtained by administrative, rather than judicial or quasi-judicial action, the burden of disproving the accusation being upon those charged. This Department is confident it can establish a clear case of discrimination with respect to the matter here at issue and offers the following data in support thereof.'

\* \* \* \* \* \*

"Apparently the provisions of the above-quoted rules to which objection is taken as unjustly discriminating against the United States and depriving it of the benefit of the export rates are those requiring delivery to a common carrier by ocean at the Pacific coast ports, the retention by the rail carriers of possession of the shipments until so delivered, the showing of a reservation of ocean space for carload freight and the first loading date of the vessel, the showing—at the time of the issuance of the shipping documents—of the ultimate destination beyond the Pacific coast ports, and the issuance of export bills of lading within a specified time after date of the domestic bills of lading with limitation, as to certain ports, to traffic interchanged over specified docks, wharves, and warehouses at said ports for movement beyond via named ocean carriers. The objection would seem to rest mainly upon the fact that these provisions are such that they cannot be observed in connection with Government shipments moving beyond the Pacific coast ports in Government owned or operated vessels, as distinguished from common carriers by ocean, and in connection with shipments as to which, by reason of the war emer-

gency, it is impracticable, if not otherwise impossible, to disclose at the time of the rail shipment the ultimate destination beyond the Pacific coast. Apparently it is recognized that shipments made in this manner and under these conditions do not conform to the specific provisions of the tariff and the view that the benefit of the export rates is nevertheless available in connection with such shipments is based apparently upon the assumption that the tariff provisions noted are unreasonable and unjustly discriminatory in relation to Government shipments.

"Insofar as there is involved only the question of the application of the export rates—freed from any question of unreasonableness or unjust discrimination—it would seem sufficiently clear that commercial shippers could not demand the benefit of the export rates on shipments moving in the manner and under the circumstances indicated as present and unavoidable in connection with the Government shipments to which this submission relates.

\* \* \* \* \* \*

"To the extent, therefore, that the availability, under the circumstances and conditions here involved, of the rail service on the basis of charges computed at the export rates may depend upon a conclusion of unreasonableness or unjust discrimination in the application of said rates otherwise, it would seem that certainty in the matter can be attained only through an appropriate determination in this respect by the Interstate Commerce Commission. In this connection there would seem appropriately for consideration also the fact that in Executive Order No. 8989, December 18, 1941, provision for administrative action, where rate adjustments are involved, is made by directing, in paragraph 3(g), that the Office of Defense Transportation shall:

" 'Represent the defense interest of the Government in negotiating rates with domestic transportation carriers and in advising the appropriate governmental agencies with respect to the necessity for rate adjustments caused by the effect of the defense program.'

"In view of the matters thus noted, therefore, I am constrained to the view that, while this office will make every effort to see that the benefit of the export rate is taken to the fullest extent available under the terms of the tariff, it would not be justified in concluding that the interests of the United States can be protected with certainty merely through audit action where the availability of the service desired, on the basis of the export rates, is made to depend upon the existence of unreasonableness or unjust discrimination in the operation of tariff provisions governing the application of said rates."

21. On June 16, 1943, J. B. Eastman, Director of Office of Defense Transportation, wrote the Interstate Commerce Commission in part as follows:

"Under the responsibilities placed upon the Office of Defense Transportation by Paragraph 3(g) of Executive Order No. 8989 of December 18, 1941, to advise appropriate Governmental agencies with respect to the necessity for the adjustment of rates caused by the effect of the defense program, I am writing to request the Interstate Commerce Commission to institute a proceeding on its own motion to determine the reasonableness and lawfulness of the application of the railroad rates and charges applicable to Government freight moving to Pacific Coast ports for exportation to the various theatres of war serviced from the Pacific Coast terminals.

"By tariff schedules filed by the railroad carriers to become effective September 3, 1942, the Pacific Coast

transcontinental railroads proposed to establish a charge of 5 cents per 100 pounds in addition to the line-haul freight rates applicable to Pacific Coast ports for terminal service at these ports in connection with transcontinental export and import traffic and to revise the carriers' rules governing the absorption of these terminal and port charges. These charges, however, did not affect the rules or regulations governing the application of the export rates. The transcontinental railroads for many years have absorbed out of the line-haul rates most of the cost of these services provided the shipments conformed to the regulations of the carriers' tariffs which stipulate that the freight must not leave the possession of the rail carriers until delivered to an ocean common carrier; the specific destinations beyond the Pacific Coast ports of export must be shown in the bill of lading or shipping order issued at the time of shipment; and that ocean shipping space shall have been secured and confirmed by the ocean carrier to the terminal railroad line.

"It is the view of the interested Government agencies and departments which have responsibility for procuring transportation services that the tariff restrictions governing the absorption of the terminal and port charges are unreasonable. Even under normal conditions, the greater part of Government property shipped to foreign ports consists of Army and Navy materials and supplies which are transported in Army and Navy transports. Under conditions of war, when the destinations of shipments cannot be disclosed for military reasons, and space cannot be arranged in advance or at any time on common carrier vessels because of the allocation of these vessels to military and naval services, the tariff restrictions upon the absorption of the port and termi-nal charges by the transcontinental railroads make it impossible for the Government agencies, including the Army, Navy, Treasury Department-Procurement Division, Lend-Lease, and Federal Surplus Commodities Corporation, to conform to the requirements. Government freight is exported in Army or Navy transports, or in tramp vessels, or in common carrier vessels. Few common carrier ocean vessels are operating as such because of wartime vessel allocation programs and such common carrier vessels as are in operation, are not operating on sailing schedules.

\* \* \* \* \* \*

"The Transcontinental carriers, through the Chairman of the Transcontinental Freight Bureau, informed my Division of Rates that the rail carriers had offered and continued to offer to apply the transcontinental export rates on Government traffic under Section 22 quotations, regardless of the class or kind of vessels used for water transportation beyond the ports, but that they could not agree to include in that offer the benefit of land-grant deduction. This information was conveyed to the interested Government departments.

"The Assistant Comptroller General of the United States has informed my Division of Rates that the General Accounting Office will make every effort to see that the benefit of the export rate is taken to the fullest extent available under the terms of the tariff. He takes the position that the interests of the United States cannot be protected with certainty merely through audit action where the availability of the services desired, on the basis of the export rates, is made to depend upon the existence of unreasonableness or unjust discrimination in the operation of tariff provisions governing the application of rates. He suggests that the Office of Defense

Transportation represent the matter to the Interstate Commerce Commission so that the Commission may, by appropriate action, determine the reasonableness and lawfulness of the application of rates and charges upon Government traffic transported by rail to Pacific Coast ports for exportation in the manner described."

22. On August 2, 1943, the Interstate Commerce Commission in Docket No. 29006 made the following order:

"*It appearing,* That the Director of the Office of Defense Transportation has advised the Commission that because of war conditions a determination by the Commission is considered necessary with respect to the lawfulness of railroad rates, rules and regulations applicable in connection with Government freight moving to Pacific coast ports for export;

"*And it further appearing,* That circumstances and conditions affecting the transportation of Government freight to Pacific coast ports for export have changed since the establishment of such rates, rules and regulations:

"*It is ordered,* That a proceeding of investigation and inquiry be, and it is hereby, instituted by the Commission into and concerning the rates, rules and regulations maintained by common carriers by railroad subject to the Interstate Commerce Act on freight transported to Pacific coast ports for export, as published in tariff of Agent L. E. Kipp, I. C. C. No. 1485, supplements thereto and reissues thereof, with a view to determining whether such rates, rules and regulations, or any of them, are unreasonable or otherwise unlawful, and to making such order or orders as may be proper in the premises.

"*It is further ordered,* That all parties to said tariff be made respondents in this proceeding."

23. On February 10, 1944, plaintiff and other carriers, who were parties to TCFB Export Tariff 29 Series, offered to the War Department and other Government agencies AAR Section 22 Quotation No. 265, quoting the export rates published in TCFB Tariff 29 Series (without land-grant deductions) on Government traffic to Pacific coast ports for export, without requiring compliance by the Government with Items 235, 270, 275, and 290 of the said tariff. The quotation applied retroactively to Government traffic shipped from points of origin named in the tariff on and after January 1, 1942. This quotation was formally accepted by the War Department through its authorized representative, as well as by other Government agencies, and provided in pertinent part as follows:

"Rates currently in effect from time to time in Trans-Continental Freight Bureau Export Tariff 29-series (not subject to land-grant deduction) will be applied by the carriers on traffic shipped by or for account of the various Departments, Bureaus and Agencies of the United States Government, and on which the United States Government assumes the freight charges, moving from origins and to United States Pacific Coast Ports named in said tariff and forwarded overseas from such ports to the destination territory named in Trans-Continental Freight Bureau Tariff 29-series but without requiring compliance upon the part of the Government with items Nos. 235, 270, 275 and 290 of said tariff. Carriers will accord like treatment to Government traffic shipped from said points of origin on and after January 1, 1942. It is expressly understood that there shall be the alternative application of either the rates made available in this item, or the domestic rates, or the domestic rates minus land-grant deduction wherever lawfully applicable, whichever rate produces the lowest charge. Rates referred to in this

item include delivery in cars to docks or to designated unloading points or to suitable interchange tracks with Government operated switching yards, as the case may be, but do not include car unloading charge or absorption of wharfage or dockage."

On August 29, 1944, AAR Section 22 Quotation No. 265–A was issued, canceling AAR Section 22 Quotation No. 265, but Quotation 265–A re-incorporated the above-quoted provision.

Both quotations included the following provision (Item 5 of No. 265 and Item 6 of No. 265–A):

"An authorized Government representative will furnish the Pacific Coast Terminal rail carriers within sixty (60) days after exportation a certificate to the effect that the traffic was loaded for a point within the destination area covered by Trans-Continental Freight Bureau Tariff 29-series and tender and acceptance of such certificate will be considered final by both Government and carrier as to destination. Said certificate should be sufficiently specific to enable Accounting Departments to determine what rate should be applied in those instances where different rates are named in the export tariff conditioned on the particular country or countries of destination.

"Note: The sixty-day limitation for certification will not apply to shipments which moved from points of origin prior to March 1, 1944."

24. On February 14, 1944, the Interstate Commerce Commission made the following order in Docket No. 29006:

"*It appearing,* That by order dated August 2, 1943, the Commission upon its own motion entered upon an investigation into and concerning the rates, rules, and regulations maintained by common carriers by railroad subject to the Interstate Commerce Act on freight transport-

ed to Pacific coast ports for export as published in tariff of Agent L. E. Kipp I. C. C. No. 1485, supplements thereto and reissues thereof, with a view to determining whether such rates, rules and regulations or any of them are unreasonable or otherwise unlawful and to making such order or orders as may be proper in the premises.

"And good cause appearing therefor:

"*It is ordered,* That this proceeding of investigation be, and it is hereby, discontinued."

25. The Quarterly Report to the President of the Office of Defense Transportation for the period ended March 31, 1944, included the following statement:

### Export Rates through Pacific Coast Ports

"At the request of ODT, the Interstate Commerce Commission by an order in Docket No. 29006, *Export Rates to Pacific Ports*, has discontinued the proceeding. The request followed acceptance by the government agencies of a Section 22 Quotation offered by the railroads following several conferences. Under this Quotation, the government will receive the benefit of the net export rates made retroactive to January 1, 1942, and in addition, shall receive the benefit of an allowance of 3¢ per 100 pounds on all traffic exported with this provision made retroactive to October 1, 1943. Terms of the Quotation will be made applicable on traffic which is stored in transit under existing Section 22 Quotations of the respective government departments and will also apply on traffic stored at the ports for a period not in excess of 90 days. It is estimated by the War, Navy and Treasury-Procurement Division Departments that there will be a saving through 1945 of approximately 78 million dollars."

*Item 235 of TCFB Export Tariff 29 Series*

26. All of the shipments in Group 5 moved from points of origin to Portland, Oregon, Seattle, Washington, or Los Angeles Harbor, California, on Government bills of lading. In the bills of lading covering the shipments to Portland and Seattle, the consignee was designated as "Soviet Purchasing Commission, c/o Moore-McCormack Coastwise Lines" or as "Soviet Purchasing Commission, c/o Moore-McCormack Lines, Inc.". The three bills for the shipments to Los Angeles Harbor described the consignee as "WSA as Prin. For A/C United Kingdom, Los Angeles Harbor, Notify So. Calif. Foreign Frt. Forwarders.". The bills of lading show that delivery of each shipment was made by plaintiff to the consignee, and the consignee's certificates of delivery were signed by the Chief Clerk or other representative of the consignee. The name of the consignee on the bills to Portland and Seattle was typed on each bill of lading above the signature of its representative in one of three forms:

(a) Moore-McCormack Line
    Coastwise Line, Agents.
        (This designation appeared on about 83 bills of lading.)

(b) Soviet Government Purchasing Commission in the U. S. A.
    Moore-McCormack Lines, Inc., Agents.
        (This designation appeared on 35 bills of lading.)

(c) Amtorg Trading Corp.
    Moore-McCormack Lines, Inc., Agents.
        (This designation appeared on 12 of the bills of lading.)

For the three shipments to Los Angeles, the certificates of delivery were signed by a representative of "War Shipping Administration, Southern California Foreign Freight Forwarders Corporation".

In Item 290 of TCFB Export Tariff 29 Series, both Amtorg Trading Company and Moore-McCormack Lines, Inc. were named as ocean carriers.

On September 15, 1939, a written contract was entered into between the Amtorg Trading Corporation, a New York Corporation, and Moore & McCormack, Inc., a Pennsylvania corporation, whereby the latter agreed to receive, deliver, handle, transship, and forward (including all inland transportation) all cargo imported and/or exported by Amtorg between the United States and the U. S. S. R., whether carried in Soviet-owned ships, chartered vessels, or by other lines.

The Amtorg Trading Corporation was an organization charged with the purchasing and shipment from the United States of goods purchased by the U. S. S. R. and, prior to the war, Amtorg was also charged with the importation of Soviet products to the United States. After this suit was filed, an investigation by the General Accounting Office disclosed that the Soviet Purchasing Commission in the United States was in charge of the activites of the Amtorg Trading Corporation, but there is no evidence as to whether this fact was known to plaintiff or the other rail carriers at the time shipments were made. Likewise, there is no evidence as to whether plaintiff or the other rail carriers had knowledge of the terms of the contract entered into between Amtorg Trading Corporation and Moore & McCormack, Inc. With the exception of one shipment to Bombay, India, the shipments moved to Archangel or Vladivostok, Russia, in ships operated by Russian lines for which Moore & McCormack, Inc. were agents.

*Item 270 of TCFB Export Tariff 29 Series*

27. TCFB Export Tariff 29 Series states that it names export commodity rates from designated States within the United States to Pacific coast ports, including Portland, Oregon, Seattle, Washington, and Los Angeles Harbor, on traffic crossing the 170th Meridian of West longitude and destined to points west thereof.

28. On May 23, 1942, the Office of Defense Transportation issued O. D. T. Instruction No. 1 entitled "Direction of Traffic Movement." It was therein stated that the purpose of the instruction was to coordinate and direct domestic traffic movements to prevent traffic congestion and to co-ordinate domestic traffic movements with ocean shipping in order to avoid terminal congestion at port areas.

Paragraph (b) of Section 502.9 of this instruction defines "O. D. T. block permit" to mean a "code designation consisting of a combination of letters and digits, and assigned to export shipments made by, or to any Governmental agency."

Section 502.10 of the instruction provided in pertinent part as follows:

"All overseas shipments originating in the United States or Canada, whether carload, bargeload, or truckload, made by, for or to any governmental agency and shipped via United States ports will move to the ports under block permits issued by the Office of Defense Transportation through the Traffic Control Division, Office of the Chief of Transportation, Headquarters, Services of Supply, War Department, Washington, D. C.:

"(a) The carriers are authorized to accept carload shipments, provided the bill of lading or shipping document bears upon its face an O. D. T. block number in substantially the following form: O. D. T. Block No. QMR–WB–1408–10. Whenever this block number appears on the shipping order, no other authorization from the Office of Defense Transportation is required even though the shipment be a commercial shipment. (See §§ 502.10(c) and 502.11). It is necessary, however, that export documents be forwarded at time of shipment to prevent delays, and every shipper should examine these documents to see that they are properly completed;

"(b) The carrier must accurately and fully transcribe O. D. T. block permit numbers on waybills. Failure to do so will result in delays and expense to owners, because absolute identification is required;"

\* \* \* \* \* \*

29. Port Embargo Number 50 of the Association of American Railroads, Car Service Division, effective June 1, 1942, states, in pertinent part, that:

"Embargo is placed on all carload and less-than-carload freight or express for export through all ports for all consignees at all destinations.

"Exceptions:

"1. Government. Carload freight or express for any consignee when bill-of-lading (either Government or commercial) and waybill bear a permit number in the following form: 'ODT Block No. QMR WB–1408–10.' Such permit numbers will be used on export freight shipped by, for or to any Governmental agency."

Said Embargo No. 50 states further under Note (C) on page 3, that:

"(C) Permits [O. D. T. Block No.] issued for the movement of freight through Pacific Coast Ports automatically become the permit of Pacific Coast terminal lines required by Trans-Continental Freight Bureau Tariff, Series 29."

30. General Order O. D. T. No. 16, issued July 6, 1942 (7 F. R. 5194), Sec. 502.40, paragraph (f) defines "O. D. T. block permit" as follows:

"(f) The terms 'O. D. T. block permit' and 'O. D. T. unit permit' mean a permit issued as herein provided as evidence of, or attesting to, the fact that cargo space is available in a vessel at a port or point in the United States for the transportation therefrom to its intended destination of the export or overseas freight to which such permit applies, or that such space will be available at such port or point for such transportation within a reasonable time

after arrival of the freight thereat, or that a bank is maintained at such port or point at or in which such freight may be held or stored pending the availability of space in a vessel for the transportation of such freight to its intended destination."

Section 502.41 of General Order O. D. T. No. 16 contained provisions similar to those set forth in Section 502.12 of O. D. T. Instruction No. 1, and in substance provided that no carrier should accept transportation for or in behalf of any Government agency to any port in the United States for transportation therefrom by water unless there was outstanding a valid and effective O. D. T. block permit with respect to such freight and port, and unless the number of the permit was endorsed on the face of the bill of lading.

31. Each bill of lading issued for the shipments in Group 5 contained on the face thereof an O. D. T. block number. By reason of the issuance of the O. D. T. instructions and the use of the block permit system, plaintiff was apprised of the fact that the shipments in Group 5 were destined for movement overseas from Portland, Seattle, or Los Angeles Harbor and that shipping space would be available at or within a reasonable time after the freight arrived at such ports. The defendant complied with the provisions of Item 275 of TCFB Export Tariff 29 Series, but there is no issue as to its compliance with that item of the tariff.

32. The forms of commercial uniform through export bills of lading prescribed by the Interstate Commerce Commission included spaces for insertion of the rail destination and the overseas port destination of the shipment as follows:

"To be carried to the port (A) of ———— and thence by ———— to the port (B) ———— (or so near thereto as vessel may safely get), and to be there delivered in like good order and condition as above, consigned, or to consignee's assigns, or to another carrier on the route to destination if consigned beyond said port (B), upon payment immediate-

ly on discharge of the property of the freight thereon, at the rate * * *."

33. The defendant failed to comply with the provisions of Item 270 of TCFB Export Tariff 29 Series, because the specific destination or destinations beyond the Pacific coast ports of export were not shown in any of the bills of lading or shipping receipts issued at the time of shipment. Although the plaintiff knew that these shipments were being exported to Russia or the United Kingdom, the specific overseas destinations were not disclosed to plaintiff and the other rail carriers in the bills of lading or by any other means.

Most of the Government bills of lading in the Group 5 category contained a reference thereon to "case marks" on an attached sheet. Below the words "case marks" on the attachment, there appeared the words "Technopromimport, U. S. S. R." After this suit was filed, the General Accounting Office learned that this marking meant that the shipment was imported from the United States by the Union of Soviet Socialist Republics, but this marking did not show the specific overseas destination.

34. On May 3, 1949, a representative of the Association of American Railroads wrote the Office of Chief of Transportation as follows:

"As you know, there are differing rates on export traffic depending upon the foreign destination to which the shipments are made. With commercial shippers the foreign destinations are clearly set forth on the bills of lading and the carriers have no difficulty in assessing and collecting the proper transportation charges. With War Department shipments, however, the destinations are not shown but instead they are coded. Consequently the carriers have no means of verifying the transportation charges on those shipments which are contended for by the General Accounting Office in its audit of the carriers' bills.

"This matter was discussed recently by representatives of the Seaboard Air Line Railroad with Mr. H. R. Johnson of your office and we understand that he suggested that there might be a possibility of the carriers being furnished with a copy of the export code covering the war period. This letter is to request a copy of the export codes which were in effect during the war for the purpose of supplying copies thereof to the port carriers so they may be in a position to determine the correct amount of transportation charges on these export shipments.

"We are of the opinion that this information is no longer classified for the reason that in August 1945 we were furnished with copy of TC Circular 60–5 supplying information in this respect for rating purposes and this information was promulgated to the railroads through my circular No. 163, copies attached for ready reference. It was our understanding, however, that these codes were the current codes and did not apply during the war period and that is the reason for this request."

The Office of Chief of Transportation replied by letter of May 24, 1949, transmitting to the Association of American Railroads copies of an unrestricted "alphabetical list of shipping designators." The list contained a code designation for many foreign ports, including the ports of Nikolaevsk, Russia, and Vladivostok, Russia. There is no indication in the record that plaintiff or the other carriers were supplied any code information disclosing the code designations of foreign ports until long after the shipments in issue moved.

### Items 285 and 290 of TCFB Export Tariff 29 Series

35. The defendant did not comply with the provisions of Items 285 and 290 of TCFB Export Tariff 29 Series for the shipments in Group 5. After these shipments were made overseas, the defendant furnished the carrier with export cer-tificates showing export to points within the destination area authorized by the export tariff. When the defendant accepted Section 22 Quotation Nos. 265 and 265–A, a contract was made and both parties acted pursuant to the terms thereof. The certificates were required by the contract and were furnished by defendant in compliance with Item 5 of AAR Section 22 Quotation No. 265 and Item 6 of AAR Section 22 Quotation No. 265–A.

36. The parties have stipulated that if the rates offered in AAR Section 22 Quotation Nos. 265 and 265–A, which provided for the export rates in TCFB Export Tariff 29 Series without land-grant deductions and without compliance by defendant with Items 235, 270, 285, and 290 of that tariff, apply to the shipments in Group 5, plaintiff is due a balance of $12,433.14. They have also stipulated that, if the export rates provided for in said tariff with land-grant deductions are applicable to such shipments, there is a balance due defendant of $29,389.37.

37. The parties have stipulated that the sum of $23,219.83 is due plaintiff as set out in finding 4. We find that plaintiff is entitled to recover from the defendant $12,433.14 on Items 235, 270, 285 and 290, and that defendant is entitled to recover from the plaintiff the sum of $388.58 as shown in finding 4 and $13,113.30 as set out in finding 6. Thus there is due plaintiff a net balance of $22,151.09.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover the sum of $35,652.97, consisting of the sum of $23,219.83, which the parties have agreed is due plaintiff as shown in our finding 4(a), (b), (c), (e), (f), and (g), and the sum of $12,433.14 for the bills in Group 5 covering the non-transited shipments in Group 5; that the defendant is entitled to recover from plaintiff the sum of $13,501.88, consist-

ing of $388.58, which the parties have agreed is due defendant as shown in our finding 4(d), and the further sum of $13,113.30 which is due defendant on the bills in Groups 2 and 3, covering shipments that were stopped in transit at Cheyenne, Wyoming, enroute to the Pacific coast ports for export; that after off-setting the amount due defendant against the amount due plaintiff, plaintiff is entitled to recover the net sum of $22,151.09, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of $22,151.09.