*2 Opinion

per curiam:

On February 6,1957, following submission of this case to the court on tbe basis of a report by the trial commissioner of this court, Roald A. Hogenson, and the briefs and arguments of counsel, the court entered an order suspending further proceedings, pending a determination by the Interstate Commerce Commission on the question as to whether defendant is entitled to the transit privileges authorized in Freight Tariff T-l-A on the shipments remaining in issue in this case. On April 21, 1958, the Interstate Commerce Commission rendered its decision holding that the defendant was not entitled to the rates provided for in the subject tariff. 808 ICC 571.
On October 14,1958, defendant moved to vacate the order of suspension to which motion plaintiff on October 15,1958, filed a notice of concurrence. Said motion was allowed on October 17,1958.
Upon a consideration of the whole record, including the decision reached by the Interstate Commerce Commission to which reference is made above, and the findings of the trial commissioner, which are hereinafter set forth and adopted by the court, we hold that plaintiff is entitled to recover. Judgment will therefore be entered for plaintiff in the sum of $1,761.17, and defendant’s counterclaim will be dismissed.
It is so ordered.
FINDINGS OF FACT
1. Plaintiff is a corporation organized and existing under the laws of the State of California, and is a common carrier by railroad in interstate commerce over its own lines and jointly with other carriers.
2. In 1943 plaintiff performed transportation services for the defendant by carrying a number of shipments of 14-ton 4x4 motor vehicles, commonly known as jeeps, on Government bills of lading issued by the War Department.
On December 1, 1953, this court entered summary judgment for the plaintiff that the jeeps were to be classified and rated as passenger motor vehicles, and entry of judgment was suspended pending disposition of issues relating to the proper amount to be paid to plaintiff for the transportation services involved in this case.
*3 Defendant with permission of the court thereafter filed its counterclaim.
3. With respect to the shipments of jeeps covered by plaintiff’s bill No. F-13764, plaintiff was the destination carrier to Stockton, California, the origin of shipment having been Wagon Works, Ohio. The parties have agreed that the lowest applicable rate for the movement to Stockton was the export rate to Stockton, without land-grant deductions, on the authority of AAB Section 22 Quotation No. 265-A Series, and that there remains a balance due plaintiff of $556.39 on plaintiff’s bill No. F-13764. No issue remains as to these shipments.
4. With respect to the shipments of jeeps covered by plaintiff’s bills Nos. F-14246 and F-14246-A, plaintiff was the inbound carrier to Lathrop, California, and the destination carrier therefrom to Oakland, California. These shipments had originated at Springfield, Illinois, were consigned to port terminals at Oakland, California, for export, turned over to plaintiff by its connecting carrier, and diverted to Lathrop, California, where they arrived between February 22 and 24, 1943. These jeeps were forwarded from Lathrop on March 9.1943, and arrived and were unloaded at Oakland on March 15.1943, and thereafter shipped overseas.
The inbound shipments to Lathrop were made on Government bills of lading WQ-12416123, WQ-12416132, WQ-12416133, WQ-12416137, WQ-12416138 and WQ-12416145, which stated Springfield, Illinois, as the origin, and Oakland, California, as the destination, and which showed an ODT block permit number and a diversion to Lathrop.
The shipments from Lathrop to Oakland were on Government bills of lading WQ-9475803, WQ-9475804, WQ-9475806, WQ-9475810, WQ-9475844 and WQ-9475867. Under the item of “Tariff Authority, to be filled in by general office rendering account,” these bills each carry a handwritten notation: “Transit Chg 3AAB Sec 22 Q No. 16.”
Lathrop was a holding and reconsigning point for Government traffic, with the privilege of storage in transit under AAB Section 22 Quotation 16.
5. With respect to plaintiff’s bills No. F-14246 andF-14246-A, plaintiff’s position is that the lowest applicable *4 rate for the movement to Lathrop, California, was the local domestic rate to Lathrop, with land-grant deductions, and the parties have agreed that on that basis there is a balance due the plaintiff of $1,204.78.
The defendant’s position, with respect to these same bills, is that the lowest applicable rate is the through export rate from point of origin to Oakland, without land-grant deductions, on the authority of Freight Tariff No. T-l-A and AAR, Section 22 Quotation No. 265-A, and the parties have agreed that on that basis there is a balance due the plaintiff of $696.35.
The parties have in effect agreed that plaintiff is due the sum of $1,204.78 unless the defendant’s theory of the case should prevail, in which event plaintiff is due the sum of $696.35.
6. The defendant has previously taken an alternative position that the lowest applicable rate on the plaintiff’s bills last above-mentioned, was the through export rate, with land-grant deductions, from point of origin to Oakland; on the authority of Freight Tariff No. T-l-A and TCFB Export Tariff 29 Series, and that on this basis there had been an overpayment by defendant in the sum of $1,055.36.
The parties agreed at pretrial conference that the issue of applicability of TCFB Export Tariff 29 Series, with land-grant deductions, would be determined and controlled by the Court’s decision in the case entitled Union Pacific Railroad Company v. United States, 132 C. Cls. 213. Pursuant to that decision defendant has consented to the dismissal of its counterclaim.
7. The parties agreed that the applicability and availability of the AAR Section 22 Quotation No. 16 was not an issue in this case. This quotation provides in pertinent part, as follows:
Property of the United States moving on War or Navy Departments’ Government bills of lading may be consigned (a) to control or storage points in the general direction of prospective ports, or (b) to such prospective ports in the first instance which because of emer-fency may be stopped enroute for storage, and such reight may be re-shipped from control or storage points by the Government within a period of two years from *5 date of movement from original point of shipment to Continental United States or Canadian ports for transshipment by vessel, subject to the following conditions:
% * * * *
7. Where storage-in-transit arrangements are published in tariffs on file with the Interstate Commerce Commission which cover a transaction as described herein, the rules and charges thereof may be applied in preference to this quotation at the option of the Government.
* * t- * *
11. RATES AND CHARGES TO APPLY FROM ORIGINAL POINT OF SHIPMENT TO FINAL DESTINATION (PORT) IN CONTINENTAL UNITED STATES OR CANADA, UPON RESHIPMENT FROM STORAGE POINT.
(E) Where transit tariffs lawfully on file with the Interstate Commerce Commission designate off-line or branch-line points as main-line points, the through rate applicable to the shipment via route of movement will be assessed without back-haul or out-of-line haul charge for the service performed in connection with such offline or branch-line movements, or where transit tariffs lawfully on file with the Interstate Commerce Commission permit stop-over or storage of any commodity at off-line or branch-line points to be treated as some other specifically named station, such basis will be applied in connection with this question.
By letter dated January 14,1943, plaintiff advised the Office of Chief of Transportation, Headquarters, Service of Supply, War Department, Washington, D. C., that the American Association of Railroads had requested plaintiff and others to advise the War Department concerning the extent to which “out-of-line” charges would be waived or equalized under paragraph 11 (E) of AAR Section 22 Quotation No. 16; that plaintiff designated Lathrop, California, among others, as a control withholding or reconsigning station, and specifically set forth the extent to which “back-haul or out-of-line haul charges” would be waived at:
LATHROP, CALIFORNIA
On traffic moving from Trans-Continental origins as defined in T. O. F. B. Territorial Directories, Lathrop is intermediate via one or more routes to all Pacific Coast ports. Therefore, under Paragraph 11 (E) and *6 tariff provision it is considered intermediate via all routes.and is subject to storage in transit charge of ¡fyfyj; per 10Ó lbs., minimum $7.35 per car.
8. T. C. F. B. Export Tariff 29 Series in effect at the time of the shipments in issue, contained a provision in Note 5 to Item 320-D, Supplement 12, as follows:
NOTE 5. — On carload traffic destined to points to which rates named herein apply, shipments are entitled to storage in transit privileges as authorized in Freight Tariff T-l, I. C. C. No. A-3435 of Agent L. E. Kipp.
9. Freight Tariff T-l-A was in effect at all times pertinent to the shipments in issue, and was entitled:
STORAGE IN TRANSIT ON COMMERCIAL FREIGHT IN CARLOADS
Originating at points in Continental United States or the Dominion of Canada when consigned to interior points in the United States and reshipped to ports in the United States for Trans-shipment by water to foreign countries and to Insular Possessions of the United States, also to Alaska by water or land, under and subject to the conditions prescribed by Section 502.42 of the Office of Defense Transportation General Order O. D. T. No. 16.
It provided in Items 1,2, 3, 8, 9 and 11, as follows:
APPLICATION OF TARIFF
Item No. 1.
Freight, in carloads, originating at points in the Continental United States or the Dominion of Canada, when moving all-rail under commercial bills of lading, may be consigned to interior points (not ports of exportation) in the United States for the purpose of being there stored and subsequently shipped all-rail to ports in Continental United States for transshipment by water to Foreign Countries and to Insular Possessions of the United States, also to Alaska by water or land, under and subject to the conditions prescribed by Section 502.42 (Transportation of commercial freight; unit permits required) of the Office of Defense Transportation General Order O. D. T. No. 16, issued July 6,1942, and effective August 1, 1942 (see Item No. 14) when such reshipments are covered by O. D. T. unit permit issued by the War Shipping Administration, or by the Transport Controller of the Dominion of Canada as the case *7 may be, on basis of through, rate applicable from original point of shipment to the port of exportation in effect via route of movement through the transit or storage point, at time of initial shipment from point of origin, plus the transit charge, subject to rules and conditions shown herein.
Freight, in carloads, to be entitled to the transit privileges named in tariff must be consigned locally to the transit point and must be tendered as “commercial freight for storage and subsequent exportation within four (4) months, under the terms and conditions of Section 502.42 of General Order O. D. T. No. 16.”
application for transit privileges
Item No. 2.
(a) Storage in transit privileges under this tariff will be granted only to parties who make written application therefor to the General Freight Department of the inbound carrier at the transit point in advance (indicating the point or points at which storage is desired) and who agree to comply fully with the rules contained herein.
(b) Parties desiring the use of the transit privileges herein described must make their own arrangements for storage and ascertain for themselves and bear the loading and unloading, storage and other charges that may be made by the transit storage facility.
definition of transit privileges
Item No. 3.
Transit privileges as referred to herein are hereby defined as storage in transit of the freight described in Item 1, in carloads, and the fowarding subsequently of the identical freight, in carloads, to a port of exportation.
preservation of identity
Item No. 8.
The identity of each commodity entitled to transit unloaded into plants or storage place of the transit user must be preserved. The commodity or commodities forwarded from the transit point must be the identical commodity or commodities originally consigned thereto for subsequent reshipment and must be forwarded from the transit point under the terms and conditions of Section 502.42 of General Order O. D. T. No. 16. (See Item No. 14)
*8 RECORDS TO BE KEPT BY TRANSIT USERS
Item No. 9.
Transit authorized herein will be granted and continued only under the following additional conditions:
(a) Transit users shall keep at the transit station, upon forms prescribed or approved by a representative of the carrier, a record of receipts there of shipments moving hereunder from all origins and of all dispositions thereof, in detail.
(b) Transit users shall, when and as requested by the carrier granting the transit, make reports in detail with respect to inbound and outbound tonnage and, when necessary to determine whether these rules are being faithfully observed, will give a representative of the carrier access to their records.
(c) Transit users shall furnish affidavits, when required by the carrier granting the transit, as to the accuracy of such records and reports.
In the event of failure or refusal to observe the above requirements or, in any particular, to conform to these rules, transit privileges shall be inapplicable.
* * * * *
surrender oe freight bills and equalization OF TONNAGE
Item No. 11.
(a) The freight bill or other authorized tonnage record, covering the movement of each shipment into the transit station must be surrendered to the'agent of the inbound lines at the time the outbound shipment is tendered for reshipment from the transit station. Such freight bill or other authorized tonnage record will thereupon be cancelled by the carrier’s Agent and rendered invalid for further transit.
(b) Where freight bills or other authorized tonnage records surrendered against the outbound movement show greater weight than the net weight of the outbound shipment, credit will be given for such excess (entitled to transit) which may be applied against subsequent reshipments.
(c) When charges are assessed to the transit station on the basis of a minimum weight in accordance with tariff rules as to minimum weight and the actual tonnage loaded into the inbound car is less than the minimum weight, only the actual weight of the commodity received at the transit station will be entitled to transit.
(d) If the weight of the shipment from the transit station is less than the prescribed carload minimum *9 weight, the difference between the weight reshipped and the carload minimum weight will be considered as non-transit tonnage, and charges on such non-transit tonnage will be assessed on the basis of the tariff rate applicable from the transit point; except that where there is a deficit in the carload minimum weight of the shipment into the transit station, as provided in Paragraph (c), a deficit not less than the deficit on the inbound shipment will be allowed in reshipment.
(e) If the weight of the shipment from the transit station exceeds the weight represented by the freight bills or other authorized tonnage records surrendered, such excess weight will not be entitled to transit rates, but will be considered as non-transit tonnage, and charges on such non-transit tonnage will be assessed on the basis of the tariff rate applicable from the transit point.
10. AAR Section 22 Quotation Nos. 265 and 265-A, in effect at the time of the shipments in issue, provided in Items 1,4, 6 and 7, as follows:
ITEM 1
Rates currently in effect from time to time in Transcontinental Freight Bureau Export Tariff 29-series (not subject to land-grant deduction) will be applied by the carriers on traffic shipped by or for account of the various Departments, Bureaus and Agencies of the United States Government, and on which the United States Government assumes the freight charges, moving from origins and to United States Pacific Coast Ports named in said tariff and- forwarded overseas from such ports to the destination territory named in Trans-Continental Freight Bureau Tariff 29-series but without requiring compliance upon the part of the Government with items Nos. 235, 270, 275 and 290 of said tariff. Carriers will accord like treatment to Government traffic shipped from said points of origin on and after January 1, 1942. It is expressly understood that there shall be the alternative application of either the rates made available in this item, or the domestic rates, or the domestic rates minus land-grant deduction wherever lawfully applicable, whichever rate produces the lowest charge. Rates referred to in this item include delivery in cars to docks or to designated unloading points or to suitable interchange tracks with Government operated switching yards, as the case may be, but do not include car unloading- charge or absorption of wharfage or dockage.
*10 ITEM 4
Except as otherwise provided in Item 2, the provisions of Items Nos. 1, 2 and 3 do not include traffic stored in transit under A. A. R. Section 22 Quotations. As to such traffic moving from origins on and after January 1, 1944, and to United States Ports named in Trans-Continental Freight Bureau Tariff 29-series and forwarded overseas from such ports to the destination territory named in said Trans-Continental Freight Bureau Tariff 29-series, carriers will apply either the export rates in effect May 14, 1943, in Trans-Continental Freight Bureau Tariff 29-series, or the Trans-Continental domestic rates of May 14, 1943, whichever rates produce the lowest charge, neither to be subject to land-grant deduction, and they will also make a terminal allowance of 3$ per 100 lbs.
ITEM 6
An authorized Government representative will furnish the Pacific Coast Terminal rail earners within sixty (60) days after exportation a certificate to the effect that the trafile was loaded for a point within the destination area covered by Trans-Continental Freight Bureau Tariff 29-series and tender and acceptance of such certificate will be considered final by both Government and carrier as to destination. Said certificate should be sufficiently specific to enable Accounting Departments to determine what rate should be applied in those instances where different rates are named in the export tariff conditioned on the particular country or countries of destination.
NOTE. — The sixty-day limitation for certification will not aply to shipments which moved from points of origin prior to March 1, 1944.
ITEM 7
Preservation of the exact identity of each inbound shipment is not required, but tonnage exported must be of the same quantity and character of traffic as handled into the depot or activity in the car specified in the certification of exportation.
With respect to Item 6, the defendant provided plaintiff with export certificates on each of the shipments involved in this case.
11. Aside from the reliance of the defendant upon the documents mentioned in the foregoing findings, there is no evi *11 dence that the defendant made any written application to plaintiff’s General Freight Department for transit privileges at Lathrop, California, with respect to the shipments in issue in this case.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of one thousand seven hundred sixty-one dollars and seventeen cents ($1,761.17).
It is further concluded that defendant is not entitled to recover on its counterclaim, and its counterclaim is dismissed.